# Greenberg Traurig

Leslie D. Corwin
Tel. (212) 801-3113
Fax (212) 801-6400
corwinl@gtlaw.com

May 28, 2008

**VIA FEDERAL EXPRESS**

Honorable Kenneth M. Karas
United States District Court
Southern District of New York
United States Courthouse
300 Quarropas Street, Chambers 533
White Plains, NY 10601

Re:    **Kelly v. Handy & Harman et al., 08 CV 00163**

Dear Judge Karas:

We write on behalf of plaintiff Dennis Kelly ("Mr. Kelly" or "Plaintiff") in the above-referenced matter in response to Defendants' letter, dated May 23, 2008 ("May 23rd Letter"). For the reasons set forth below and in Plaintiff's prior submissions to the Court, Plaintiff should be permitted to take additional limited discovery from Defendants in an effort to determine (i) whether the administrative record is in fact complete as Defendants contend, and (ii) whether Plan Administrators Louis Klein and Garen Smith suffered from conflicts of interest in denying Mr. Kelly's benefits claims, and if so, whether such conflicts influenced their respective decisions.

**Mr. Kelly Is Entitled To Additional Discovery From Defendants,
Including The Depositions of Mr. Klein and Mr. Smith,
The Conflicted Plan Administrators Who Denied His Benefits Claims**

Once again, Defendants contend that they have produced all relevant documents to Mr. Kelly and they expend considerable effort arguing that any additional documents he seeks are "beyond the administrative record." (May 23rd Letter at 3-8.) Defendants' depiction of the administrative record is self-serving, however, and should be rejected. Mr. Kelly is not requesting documents that are beyond the administrative record. Rather, he seeks documents that *are a part of the administrative record*, but which Defendants wrongfully have withheld.

In their May 23rd Letter, Defendants stick to their self-defining and wholly conclusory standard of relevancy and fail to explain precisely why they deem certain categories of documents irrelevant and "beyond the scope of the administrative record" under 29 C.F.R. § 2560.503-1(m)(8). They fail to explain, for example, their non-production of post-1998 H&H or WHX Board minutes referring to Mr. Kelly (Request No. 9), and financial data supplied to the WHX Board regarding the January 1998 or August 1998 SERPs (Request No.

ALBANY
AMSTERDAM
ATLANTA
BOCA RATON
BOSTON
BRUSSELS*
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LONDON*
LOS ANGELES
MIAMI
MILAN*
NEW JERSEY
NEW YORK
ORANGE COUNTY
ORLANDO
PHILADELPHIA
PHOENIX
ROME*
SACRAMENTO
SILICON VALLEY
TALLAHASSEE
TOKYO*
TYSONS CORNER
WASHINGTON, D.C.
WEST PALM BEACH
ZURICH

*Strategic Alliance
Tokyo-Office/Strategic Alliance

Honorable Kenneth M. Karas
May 28, 2008
Page 2

12). These Requests are plainly relevant to Mr. Kelly's benefits claims and their denial by the conflicted Plan Administrators. Among other things, these Requests go to the issues of Defendants' early awareness of the August 1998 SERP and the purported reasons for Mr. Kelly's termination for cause, which served as key factors in the Claim Administrator's denial of his benefits claims.

Defendants also fail to justify their incomplete production of documents in response to Request Nos. 30 and 31, both of which seek core information regarding Defendants' awareness of the August 1, 1998 SERP and Mr. Kelly's claims under the other Plans at issue. *See* Exh. C to Plaintiff's May 16, 2008 Letter at 4. Rather than explain the limited scope of their production in response to these Requests, in their May 23rd Letter, Defendants state in conclusory fashion that H&H "produced all relevant information relating to the SERP and Life Insurance Plan" and that any other responsive documents "would have no relevance to Plaintiff's claim." (May 23rd Letter at 7.)

For an interested party to unilaterally decide the scope of relevant discovery is absurd. What relevancy standard did Defendants apply in responding to Plaintiff's Requests? Was it consistent?[1] Which documents did they withhold? There are no answers. Defendants should be required to produce all of the relevant and responsive documents they withheld, which appear to include documents from the Human Resource Departments of H&H, WHX, and Steel Partners that refer to Mr. Kelly (Request No. 30), and documents concerning Mr. Kelly's termination and the Plans at issue exchanged between H&H, WHX, and Steel Partners executives and directors and Mr. Marciniak (Request No. 31). Defendants also should be required to produce all documents relating to Mr. Kelly's termination, which took place before the Claim Administrator rendered his decision. (Request No. 32). It is beyond any serious dispute that the Claim Administrator would have to have considered such information and Defendants' alleged reasons for Mr. Kelly's termination in rendering his decision denying Plaintiff's benefits claim.

While Defendants predictably focus on the documents that they produced to Mr. Kelly, and an inadvertent error contained in our May 16th Letter,[2] what matters here are the relevant documents they chose not to produce, which are a part of the administrative record. In case the

---

[1] Even though Defendants deemed certain document requests irrelevant (*see, e.g.,* Request Nos. 5 and 32), they produced a subset of responsive documents. *See* Exh. D to May 16th Letter at 2, 8. In response to other allegedly irrelevant Requests (*see, e.g.,* Request Nos. 16, 21), Defendants refused to produce *any* documents.

[2] In our Appendix to the May 16th Letter, we mistakenly described Request Nos. 13 and 14 as seeking documents relating to the August 1, 1998 SERP, when in fact, the Requests sought documents regarding the *WHX* SERP, a separate and distinct pension plan. (May 16 Letter at 10 & Exh. C.) Request Nos. 13 and 14 are accurately set forth in Exhibit C to our May 16th Letter, and we regret any confusion caused by this inadvertent error.

Honorable Kenneth M. Karas
May 28, 2008
Page 3

relevance of these documents is not obvious, one need only consult Mr. Klein's decision denying Mr. Kelly's benefits claim. *See* September 27, 2006 letter from Louis Klein to Dennis Kelly, a true and correct copy of which is annexed hereto as Exhibit A. Among other things, Mr. Klein determined that:

- Based on the written record, it is clear that Dennis Kelly actively collaborated with Dixon throughout the drafting process and was privy to the decision making that Dixon undertook in preparing the alleged new SERP.[3] Kelly was aware that the dates on the SERP were bogus and that the document was signed in 2003. *See* Exh. A at 4 (emphasis added).

- Kelly was a recipient of the package and did not disclose to any member of the H&H Board or to WHX the highly unusual circumstances surrounding the preparation and background of the plan, although he should surely have known that these events were contrary to customary corporate operations. *Id.* at 5 (emphasis added).

- Kelly never disclosed to the Boards of H&H or WHX that work on a revised plan was underway between 1999 and 2003. Nor did he seek approval for the revised plan or for any changes to the existing SERP plan during those years, or later. *Id.* (emphasis added).

- At no time before 2005 did Kelly disclose to H&H's Board that the alleged new SERP dated as of August 1, 1998 was in fact generated largely between 2001 and 2003. *Id.* (emphasis added).

- The deception perpetrated by Dixon in connection with the alleged new SERP was accomplished with the active support of Dennis Kelly. Exh. A at 6 (emphasis added).

- In connection with his advice to H&H, at no time did Kelly disclose to anyone on the H&H Board, or at WHX, any aspect

---

[3] The "alleged new SERP" that Mr. Klein refused to recognize is the August 1998 SERP, pursuant to which Mr. Kelly seeks ERISA and other benefits in this action.

Honorable Kenneth M. Karas
May 28, 2008
Page 4

_____

of his work or that of Dixon in creating the alleged new SERP.
. . . *Id.* (emphasis added).

- A review of Dixon's expense account submissions from 2003-
2005 indicates that he knowingly submitted invalid expense
claims. All of these expenses were approved by Kelly. *Id.*
(emphasis added).

- I find the evidence inconclusive as to whether Kelly was a
faithless servant while employed by H&H. *Id.* (emphasis
added).

Obviously, Plaintiff contests each of these determinations, which place in issue not only
Mr. Klein's conflict of interest as a director of WHX and a member of the WHX Compensation
Committee, but also Defendants' notice of the August 1998 SERP and the pretextual reasons
for Mr. Kelly's termination, which took place a year before Mr. Klein rendered his decision.
Indeed, prior to rendering his one-sided decision, Mr. Klein *never personally interviewed
Mr. Kelly.* Instead, he interviewed and relied upon the testimony of WHX President Stewart
Tabin, H&H and WHX executive Robert Hynes, and former H&H President and WHX Board
member, Robert LeBlanc. Mr. Klein's slanted investigation of Mr. Kelly's claims is yet
another reason why he -- as well as Garen Smith, the Plan Administrator who denied Mr.
Kelly's appeal -- should be deposed, and why the core documents Mr. Kelly seeks in this
application -- *those sought in Request Nos. 9, 21, 30, 31, and 32* -- are crucial to his ERISA
claims in this action.

To the extent the Court determines that the requested discovery goes beyond the
administrative record, the Court has discretion to allow it, a fact Defendants now concede (May
23rd Letter at 2-3). *See Schalit v. Cigna Life Ins. Co. of N.Y.*, No. 07 Civ. 0476, 2007 WL
2040587, *2 (S.D.N.Y. July 12, 2007) ("[D]iscovery geared toward assessing potential conflicts
of interest and the clarity of plan language would be proper, particularly if the standard of
review has not yet been determined.") (citation omitted); *Harrison v. Metropolitan Life Ins.
Co.*, 417 F. Supp. 2d 424, 435-36 (S.D.N.Y. 2006) (directing additional discovery on the issue
of whether the plan administrator suffered from a conflict of interest prior to determining the
appropriate standard of review of the administrator's decision denying benefits); *Samedy v.
First Unum Life Ins. Co. of Am.*, No. 05-CV-1431, 2006 WL 624889, *3 (E.D.N.Y. Mar. 10,
2006) ("[I]t is unlikely that any alleged influence of a structural conflict of interest in making
claim determinations will be apparent from the administrative record. Accordingly, the Court
will permit limited discovery outside the administrative record in order to provide plaintiff with
an opportunity to obtain discovery on this issue.").

Honorable Kenneth M. Karas
May 28, 2008
Page 5

There are ample grounds for the Court to direct the depositions of Mr. Klein and Mr. Smith.[4] Plaintiff previously asserted that Defendants refused to pay him severance payments and ERISA benefits due to their desire to further the acquisition of WHX by Steel Partners. *See* March 12, 2008 Letter to the Court, at 2-3. It is beyond dispute that Defendants were aware of the August 1998 SERP. Indeed, from 1998 through 2005, WHX and H&H openly used and relied on the August 1998 SERP, disclosing it in SEC filings and using it to make benefit payments to former H&H executives. Yet, in order to avoid scuttling the transaction with Steel Partners in early 2005, Defendants orchestrated a plan to disavow the August 1998 SERP and avoid any liability thereunder. Plainly, this raises a conflict of interest on the part of H&H, WHX, and the Plan Administrators who denied Mr. Kelly's benefits claims. As previously stated, we believe these conflicts affected the decisions of Mr. Klein and Mr. Smith in denying Plaintiff's benefits claims. *Id.* at 3. Thus, contrary to Defendants' assertion in the May 23rd Letter, Mr. Kelly's assertion of a conflict of interest by the Plan Administrators is not based solely on their status as directors of WHX and members of the WHX Compensation Committee (which implicate separate conflicts of interest). *See* Defendants' May 23rd Letter at 9-10.

Mr. Kelly respectfully submits that he has only scratched the surface of the Plan Administrators' conflicts of interest and the depositions of Mr. Klein and Mr. Smith likely will reveal more.[5] At a bare minimum, depositions of these two individuals -- both of whom owed fiduciary duties to Plaintiff and yet, neither of whom saw fit to interview Mr. Kelly personally prior to denying his benefits claims -- will allow Plaintiff a fair opportunity to support his contention that the Court should apply a *de novo* standard of review to the biased decisions of the Plan Administrators. *See Schalit*, 2007 WL 2040587, at *2; *Harrison*, 417 F. Supp. 2d at 435-36; *Samedy*, 2006 WL 624889 at *3.

### Defendants' Arguments Regarding The Fiduciary Exception Are Misplaced

The fiduciary exception to the attorney-client privilege prevents ERISA plan fiduciaries from asserting the attorney-client privilege against plan beneficiaries regarding otherwise privileged communications that relate to the administration of the plan. *See, e.g., Martin v.*

---

[4]    Plaintiff originally requested the depositions of Plan Administrators Louis Klein and Garen Smith, and Hal Lieberman, an attorney retained by H&H to provide an expert opinion on attorney ethics. Mr. Lieberman's opinion related to the conduct of Paul Dixon, H&H's former General Counsel, not Mr. Kelly. Since Mr. Lieberman's opinion regarding Mr. Dixon is not currently at issue in this action, Plaintiff does not seek to depose Mr. Lieberman.

[5]    For this reason, the cases cited by Defendants on pages 9-10 of the May 23rd Letter are inapposite. Until Plaintiff is allowed a full and fair opportunity to conduct discovery regarding the Plan Administrators' alleged conflicts of interest, it is premature to argue that an arbitrary and capricious standard of review, rather than *de novo*, should be applied.

Honorable Kenneth M. Karas
May 28, 2008
Page 6

_Valley National Bank_, 140 F.R.D. 291, 322 (S.D.N.Y. 1991). While this concept is applied most frequently in the ERISA context, the fiduciary exception is actually product of trust law. The common law recognizes an obligation on the part of a trustee to provide full and accurate information to a beneficiary regarding his or her management of the trust. As part of this obligation, the trustee must make available to the beneficiary, on request, any communications with an attorney that are intended to assist in the administration of the trust. _Martin_, 140 F.R.D. at 322 (citing Bogert & Bogert, The Law of Trusts and Trustees, § 961 at 11 (rev. 2d ed. 1983)).

In this case, the SERP at issue is comprised of two legal entities, a top-hat plan and a Rabbi trust. The top-hat plan is maintained for the purpose of providing deferred compensation to plan beneficiaries, and the Rabbi trust is the funding vehicle for the SERP. _See_ Department of Labor Advisory Opinion 91-16A, a true and correct copy of which is annexed hereto as Exhibit B. While it is true that a top-hat plan is not subject to ERISA's fiduciary requirements, the same is not true for the trustees of a Rabbi trust. Even under a top hat plan, a Rabbi trustee's common law duties to a beneficiary would still apply.

Thus, in SERP at issue, the trustees of the Rabbi trust -- the funding vehicle for the SERP -- still owe a fiduciary duty to plan beneficiaries like Mr. Kelly. Pursuant to this fiduciary duty, the trustees are required to provide full and accurate information regarding the administration of the plan, including any communications that would otherwise be protected by the attorney-client privilege.[6]    In other words, in this case, which involves not just a top-hat plan but a Rabbi trust, the fiduciary exception to the attorney-client privilege still applies and Defendants should be required to produce the allegedly privileged documents they have withheld. None of Defendants' cited cases address the application of the fiduciary exception to the attorney-client privilege in this unique context. _See_ May 23rd Letter at 8-9.

---

[6]    Even a cursory review of Defendants' three-page privilege log raises serious questions regarding the propriety of Defendants' privilege designations. _See_ Exh. B to Defendants' May 23rd Letter. Among other things, Defendants provide superficial descriptions of the subject matter of the alleged privileged communications, and it is profoundly unclear as to whether the documents at issue actually involve a request for legal advice or the provision of legal advice. Even based on the skeletal descriptions contained in the log, document numbers 1, 2, 13, and 14, do not appear to be privileged. For these reasons, we respectfully request that the Court, or a Magistrate appointed by the Court, conduct an _in camera_ review of the documents listed on Defendants' privilege log and determine the propriety of Defendants' privilege designations.

Honorable Kenneth M. Karas
May 28, 2008
Page 7

On the issue of whether the "Remaining Defendants" are properly named in this action, since Defendants' May 23rd Letter regurgitates previously-asserted arguments, Plaintiff will not re-address them here, and respectfully refers the Court to its March 12 and May 16, 2008 letters.[7]

Respectfully submitted,

GREENBERG TRAURIG, LLP

By:

Leslie D. Corwin

cc:    Thomas Fleming, Esq. (via e-mail)
       Mr. Dennis Kelly (via e-mail)

---

[7]    In the May 16th Letter, we incorrectly stated that Mr. Kelly had filed a Deferred Vested Pension Application for the H&H/WHX Pension Plan on October 20, 2006. *See* May 16th Letter at p. 7.   While Mr. Kelly executed the application, he never filed it with H&H because it was a supplemental plan to the August 1998 SERP, which H&H refused to recognize.   Given H&H's position concerning the August 1998 SERP, any request for benefits under the supplemental H&H/WHX Pension Plan would have been an exercise in futility.

# EXHIBIT A

Louis Klein
Claim Administrator
c/o Handy & Harman
555 Theodore Fremd Avenue
Rye, New York 10580.

September 27, 2006

Mr. Dennis Kelly
c/o Leslie D. Corwin, Esq.
Greenberg Traurig, LLP
MetLife Building
200 Park Avenue
New York, NY 10166

Re:    Claim for Benefits

Dear Mr. Kelly:

I am the Claim Administrator for the Handy & Harman Supplemental Executive Retirement Plan (the "SERP") and for the Handy & Harman Executive Post Retirement Life Insurance Program (the "Life Insurance Program"). I was appointed by the Plan Administrator (the Compensation Committee of the Board of Handy & Harman) for each of these plans, pursuant to rules that each Plan adopted in June 2006. I have reviewed your claims under each of these Plans and my findings are set forth below. I based my conclusions upon my review of the documents on the annexed Exhibit B, all of which are available for your review and consideration, the reports of Margolin Winer & Evens LLP ("MWE") and Hal Lieberman, Esq. (both enclosed), as well as my interviews of Stuart Tabin, Robert Hynes and Robert LeBlanc. Here are my conclusions.

### The SERP Benefit Claim

#### Background

1.    From approximately 1992 through September 2005, Paul E. Dixon ("Dixon") was General Counsel to Handy & Harman ("H&H"), a New York corporation, based in Rye, New York. Dixon was a member of the New York Bar, admitted to practice in 1972.

2.    From approximately 1998 to September 2005, Dennis Kelly served as Vice President, Controller or Chief Financial Officer for H&H, and held other positions in its accounting department before then.

3.    At all times relevant, H&H maintained a Supplemental Executive Retirement Plan ("SERP") which provided retirement benefits for approximately seven members of its senior management. WHX Corp. ("WHX") acquired H&H in April 1998, at which time H&H became a wholly owned subsidiary of WHX.

514288-1

September 27, 2006
Page 2

    4.      Effective January 1, 1998, the Board of H&H adopted a new SERP Plan, which was in place in April 1998 when WHX acquired H&H. The January 1, 1998 SERP provided in Section 7 that it could only be amended by action of the H&H Board.

    5.      Dixon and Kelly were both beneficiaries of this SERP. Based on his compensation level and his years with the Company, Dixon was one of its largest beneficiaries from 1999 through 2003, and after 2003, the largest single beneficiary. This fact was known to Kelly.

<u>Board Discussions Regarding a Revised or New SERP</u>

    6.      At a board meeting held October 30, 1998, the H&H Board reviewed the benefits available under three existing executive compensation plans and discussed possible changes to these plans. These plans were: (i) the Management Incentive Plan ("MIP Plan"); (ii) the Long-Term Incentive Plan ("LTIP Plan"); and (iii) the SERP. The minutes of the 10/30/98 meeting state:

> After discussion and agreement in concept with respect to these proposed Plans, it was agreed that the Management Incentive Pan, the Long-Term Incentive Plan and the SERP, including a bonus at the 100% level, would be referred for discussion and approval to the WHX Board of Directors.

    7.      At a February 2, 1999 meeting, the Compensation Committee of the WHX Board reviewed and approved a new MIP Plan for 1999. The minutes of the February 2, 1999 meeting of the WHX Board's Compensation Committee state:

> At this point, Robert LeBlanc, the Chief Executive Officer of Handy & Harman ("H&H"), joined the meeting. Mr. LeBlanc reviewed with the Compensation Committee proposed bonuses to be paid to employees of Handy & Harman under H&H's 1998 Management Incentive Plan. He described in detail the operation of such plan and the methodology in determining bonus payments under such plan. Mr. LeBlanc also described the existing H&H Long Term Incentive Plan, and presented to the Compensation Committee payments proposed to be made under such plan. Mr. LeBlanc also described to the Compensation Committee, the new Management Incentive Plan being developed by the management of H&H and agreed to present a new Long Term Incentive Plan to the Compensation Committee at its next meeting. After a full discussion, upon motion duly made, seconded and unanimously carried

514288-1

September 27, 2006
Page 3

> RESOLVED, that the Compensation Committee does hereby acknowledge and approve the methodology of bonus payments to be made by the management of H&H pursuant to the H&H 1998 Management Incentive Plan and the Long Term Incentive Plan; and it is further
>
> RESOLVED, that the Compensation Committee does hereby ratify and approve the adoption by H&H's Board of Directors of H&H's Management Incentive Plan for 1999 substantially in the form of the draft submitted to the Compensation Committee.

8.    At its August 4, 1999 meeting, the Compensation Committee of the WHX Board reviewed and approved a new LTIP Plan.  The minutes of the meeting held on August 4, 1999, state:

> At this point, Robert LeBlanc, the Chief Executive Officer of Handy & Harman, and Paul Dixon, General Counsel of Handy & Harman, joined the meeting. Messrs. LeBlanc and Dixon reviewed for the Compensation Committee the Handy & Harmon Long-Term Incentive Plan, including its structure, potential awards and its goals.
>
> After a full discussion, upon motion duly made, seconded and unanimously carried, it was
>
> RESOLVED, that the Compensation Committee does hereby ratify the approval and implementation by the Board of Directors of Handy & Harman of the Handy & Harman Long-Term Incentive Plan.

9.    The only modifications to the SERP presented for discussion at any of the above meetings were whether (i) to increase the amount of the annual bonus to be included in the calculation from 25% to 100% and (ii) to implement a new SERP so that payments made under January 1, 1998 SERP (when WHX acquired H&H) would not be credited against the benefits of the participants.  Neither of these modifications was ever adopted.  Neither the WHX Board, the H&H Board, nor the WHX Compensation Committee was ever presented with any financial information regarding the costs of additional benefits under a new or revised SERP, or with drafts of any proposed plan changes.

10.    No discussion of any proposal for a new or revised SERP occurred at any subsequent meeting of the WHX or H&H Board or the WHX Compensation Committee.

514288-1

3

September 27, 2006
Page 4

11.    Neither the WHX Board, the H&H Board, nor the WHX Compensation Committee ever approved a new or revised SERP, or was provided with information sufficient to do so.

<u>Dixon's Preparation and Dissemination of a Revised SERP</u>

12.    From 1999 through 2003, Dixon used his position as general counsel of H&H to direct the drafting of an alleged new SERP Plan and other alleged new benefit plan documents. Among other things, in 1999, Dixon instructed H&H's actuarial firm to prepare a draft plan document and in 2001 he retained outside attorneys who revised this draft and prepared related documents in a process that lasted until May 2003. The alleged new SERP Plan awarded Dixon and other executives significantly greater financial benefits than the existing SERP dated January 1, 1998.

13.    The drafts of the alleged new SERP generated between 1999 and 2003 used several dates, including "amended and restated as of June 1, 1999," and "amended and restated as of January 1, 2002." Because these years were after the 1998 acquisition by WHX, their appearance in the document would have been a red flag to WHX executives, including those on the H&H Board, that the document was a new plan. The alleged new SERP in its final form stated that it was "amended and restated as of August 1, 1998." Dixon apparently selected the "August 1, 1998" date arbitrarily, unrelated to any Board action or authorization.

14.    In 2003, Dixon signed the alleged new SERP plan "on behalf of Handy & Harman as of the date set forth above," *i.e.*, August 1, 1998. On its face, the document appeared to have been generated at or about that date. At or about the same time, Dixon also signed a series of related plan documents on behalf of H&H, all dated August 1, 1998, but prepared in 2002 and 2003.

15.    Based on the written record, it is clear that Dennis Kelly actively collaborated with Dixon throughout the drafting process and was privy to the decision making that Dixon undertook in preparing the alleged new SERP. Kelly was aware that the dates on the SERP were bogus and that the document was signed in 2003.

16.    Kelly was also aware that the alleged new SERP imposed significant financial obligations upon H&H.

17.    It is my conclusion that the alleged new SERP plan dated August 1, 1998 is not a valid benefit plan and none of its alleged beneficiaries are entitled to its purported benefits. The SERP Plan dated January 1, 1998 is the valid Plan.

<u>Kelly's Eligibility</u>

18.    Kelly was born on March 11, 1952 and has not reached retirement age under the SERP. He is therefore not yet eligible for benefits.

4

514288-1

September 27, 2006
Page 5

<u>Kelly's Role in Dixon's Misconduct</u>

19.    In August 2003, in his capacity as general counsel for H&H, Dixon distributed to H&H senior management the alleged new SERP Plan along with a related benefit plan. The related benefit plan, a purported Life Insurance Program, was also signed by him in 2003 and created under his supervision that year. This related Plan was dated "effective August 1, 1998." The package sent by Dixon to other members of H&H senior management also included a "lump sum election" form. Under both the existing SERP and the alleged new SERP, this form had to be submitted prior to retirement in order to receive pension benefits in a lump sum. Dixon asked his fellow members of H&H senior management to return their election forms to him. His cover memo gave no indication that the accompanying Plan replaced an earlier plan, or that the August 1, 1998 date was chosen by Dixon although the plan was in fact prepared between 2001 and 2003.

20.    Kelly was a recipient of the package and did not disclose to any member of the H&H Board or to WHX the highly unusual circumstances surrounding the preparation and background of the plan, although he should surely have known that these events were contrary to customary corporate operations.

21.    The alleged new SERP plan, if effective, would have a material impact upon the finances of H&H. The alleged new SERP Plan also included many benefit changes beyond a change in the definition of salary to include 100% of bonus. These other changes, if effective, by themselves would have a material impact upon the finances of H&H, as well as WHX. In light of WHX's precarious financial condition, such changes would have been discussed by the Board in great detail.

22.    Dixon was the largest individual beneficiary of the alleged new SERP and the related documents that he signed in 2003 on behalf of H&H. In 2005, Dixon claimed entitlement to approximately $3.78 million in retirement benefits pursuant to the alleged new SERP and the related plan documents. Kelly too was a material beneficiary of the alleged new SERP, making a claim for approximately $3.6 million in benefits at the same time as Dixon. Under the January 1, 1998 SERP, Kelly would have been entitled to a fraction of this amount in retirement benefits, without giving credit to his earlier receipt of $96,287 under this plan.

23.    Kelly never disclosed to the Boards of H&H or WHX that work on a revised plan was underway between 1999 and 2003. Nor did he seek approval for the revised plan or for any changes to the existing SERP plan during those years, or later. At no time before 2005 did Kelly disclose to H&H's Board that the alleged new SERP dated as of August 1, 1998 was in fact generated largely between 2001 and 2003.

24.    From time to time between 1999 and 2004, H&H consulted with Dixon, as corporate counsel, regarding the amount of benefits due under the existing SERP. In connection with his legal advice, at no time did Dixon disclose to anyone on the H&H Board, or at WHX, any aspect of his work in creating the alleged new SERP, including without limitation, that (i) the salary computation for SERP benefits that included 100% of bonus varied from the written plan document dated January 1, 1998; (ii) he stood to gain a substantial amount from the

514288-1

5.

September 27, 2006
Page 6

application of this 100% bonus standard to his own retirement package; (iii) the alleged new SERP Plan dated August 1, 1998 was generated under his supervision between 2001-2003; or (iv) the August 1, 1998 date for the alleged new SERP was arbitrarily selected by him.

25.    From time to time between 1999 and 2004, H&H consulted with Dennis Kelly, as its Chief Financial Officer, regarding the amount of benefits due under the existing SERP. In connection with his advice to H&H, at no time did Kelly disclose to anyone on the H&H Board, or at WHX, any aspect of his work or that of Dixon in creating the alleged new SERP, including without limitation, that (i) the salary computation for SERP benefits that included 100% of bonus varied from the written plan document dated January 1, 1998; (ii) he (Kelly) stood to gain a substantial amount from the application of this 100% bonus standard to his own retirement package; (iii) the alleged new SERP Plan dated August 1, 1998 was generated between 2001-2003 with his collaboration; or (iv) the August 1, 1998 date for the alleged new SERP was arbitrarily selected by Dixon.

26.    The deception perpetrated by Dixon in connection with the alleged new SERP was accomplished with the active support of Dennis Kelly. Their efforts have caused H&H substantial loss, including payments to Messrs. Arnold Nance and Robert LeBlanc at levels inconsistent with the SERP dated January 1, 1998 and the payment of legal fees to Jacobs Persinger & Partners for their work in drafting the alleged new SERP

27.    I understand from Court filings that Dixon and Kelly have taken the position that H&H's payments to Arnold Nance and Robert LeBlanc, as well as certain statements in the WHX proxy materials, demonstrate that the alleged new SERP is a valid plan. I find that this is mistaken for at least three reasons. First, the January 1, 1998 SERP provides that it can only be amended by action of the Board of H&H. None of the items to which Dixon and Kelly point constitutes a board action approving an amendment or a new plan. Second, each of the events occurred as a result of information obtained by H&H through Dixon or Dennis Kelly, without disclosure of the true facts concerning the alleged new SERP, or that calculations based on 100% of MIP bonus were inconsistent with the SERP Plan as written dated January 1, 1998. Third, the alleged new SERP contains material terms that go beyond the use of 100% MIP bonus in calculating benefits, including the addition of early retirement benefits, modifications to the change of control provision, and the inclusion of "gross up" provisions.

28.    A review of Dixon's expense account submissions from 2003-2005 indicates that he knowingly submitted invalid expense claims. All of these expenses were approved by Kelly. The last full year that Dixon's expenses were reviewed by Robert LeBlanc he charged $26,693.51 in the aggregate as business expenses including a total of $2,250.34 for meals. Under Dennis Kelly's review, he charged $70,620 in 2004, including $10,639 in meals. For the first 8 months of 2005, he charged $62,797, including $11,783 in meals.

29.    I find the evidence inconclusive as to whether Kelly was a faithless servant while employed by H&H. At this stage, I find that he is eligible for benefits in accordance with the SERP Plan, without prejudice to H&H's right to seek a court ruling that he was in fact a faithless servant for all or a portion of the years in question.

6

September 27, 2006
Page 7

30.    To the extent any benefits are paid to Kelly under the SERP, it is entitled to a credit in the amount of $96,2878 representing the amount paid to him under the SERP Plan in April 1998.

31.    In addition, I find that under Section 11 of the SERP, Kelly is not eligible for the lump sum option offered by the SERP. Kelly received a lump sum payment of benefits under this Plan pursuant to Section 10 in April 1998 in connection with the WHX acquisition of H&H. The language of Section 11 of the Plan indicates that a participant who receives a lump sum payment under the plan through a "change in control" is not eligible for a second lump sum payment.

32.    I have made the foregoing determination pursuant to Section 6 of the SERP. I have annexed as Exhibit A, a computation of your projected benefits prepared by our outside actuarial firm based upon these determinations.

Further Proceedings

You are entitled to appeal from this determination which appeal shall be reviewed by the entire Compensation Committee of H&H in its capacity as Plan Administrator. You are permitted to submit written comments, documents, and other information relating to your claim for benefits as well as any other information upon which you rely in contending that this determination is erroneous. Your submission shall constitute your appeal for this determination. Your appeal must be submitted no later than sixty days following receipt of this notification of an adverse benefit determination. You are entitled to receive, upon request and free of charge, reasonable access to and copies of all documents, records and other information relevant to your claim for benefits. I am enclosing with this letter copies of the documents referenced on the Schedule A.

Pursuant to the rules adopted by the Plan Administrator, the Plan Administrator's review of any appeals shall take into account all comments, documents, records and other information submitted by you relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination. You will receive written or electronic notification of the determination of the appeal upon the earlier of (i) within five days after the next regular meeting of the Compensation Committee, provided the appeal is received at least thirty days before the meeting or (ii) sixty days after receipt of the appeal by the Plan Administrator, unless the Plan Administrator determines special circumstances requiring an extension of time for processing the appeal, which extension shall be no more than sixty days on notice to you. All communications with the Plan Administrator or the H&H shall be deemed valid upon delivery by hand, overnight courier or registered mail addressed to the SERP Plan Administrator, c/o Handy & Harman, 555 Theodore Fremd Avenue, Rye, New York 10580.

Please be further advised that you have the right to bring a Civil Action under Section 502(a) of the Employees Retirement Income Securities Act ("ERISA"), 29 U.S.C. § 1132(a), following an adverse determination on review.

514288-1

September 27, 2006
Page 8

<u>The Life Insurance Program Benefit Claim</u>

33.     Handy & Harman established an Executive Post Retirement Life Insurance Program, effective as of January 1, 1995. The Life Insurance Program provides that H&H, "through its Board of Directors, shall maintain at all times complete authority to terminate the program or amend or modify the provisions thereof anytime...." (Life Insurance Program ¶6)

34.     In connection with the preparation of the Plan documents for an alleged new SERP, Dixon directed outside counsel to prepare an alleged amendment to the Life Insurance Program, purportedly effective August 1, 1998. This document was apparently signed by Dixon in 2003.

35.     In addition, Dixon also directed outside counsel to prepare an alleged "Restated Executive Post Retirement Life Insurance Program," also purportedly effective as of August 1, 1998, which he signed in May 2003, purportedly on behalf of Handy & Harman as of "August 1, 1998." Neither of these alleged plans or amendments were approved by the Board of H&H. Accordingly, neither of these is valid.

36.     The alleged new Life Insurance Program was prepared pursuant to the same deceptive program as set forth above for the alleged new SERP and Dixon was also a significant beneficiary of the alleged new Life Insurance Program. Kelly participated in this deception in the same manner as he did with respect to as the alleged new SERP.

37.     Under Section 5 of the Life Insurance Program, the Company is obligated to transfer to Kelly its ownership rights in the post-retirement policy, provided that Kelly pays H&H an amount equal to the cash surrender value of the post-retirement policy. The cash surrender value of the policy (#6041212) is now $132,820.05. Accordingly, upon payment of this amount H&H will transfer to Kelly the post retirement policy.

<u>Further Proceedings</u>

You are entitled to appeal from this determination which appeal shall be reviewed by the entire Compensation Committee of H&H in its capacity as Plan Administrator. You are permitted to submit written comments, documents, and other information relating to your claim for benefits as well as any other information upon which you rely in contending that this determination is erroneous. Your submission shall constitute your appeal for this determination. Your appeal must be submitted no later than sixty days following receipt of this notification of an adverse benefit determination. You are entitled to receive, upon request and free of charge, reasonable access to and copies of all documents, records and other information relevant to your claim for benefits. I am enclosing with this letter copies of the documents referenced on the Schedule A.

514288-1

September 27, 2006
Page 9

Pursuant to the rules adopted by the Plan Administrator, the Plan Administrator's review of any appeals shall take into account all comments, documents, records and other information submitted by you relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination. You will receive written or electronic notification of the determination of the appeal upon the earlier of (i) within five days after the next regular meeting of the Compensation Committee, provided the appeal is received at least thirty days before the meeting or (ii) sixty days after receipt of the appeal by the Plan Administrator, unless the Plan Administrator determines a special circumstances requiring an extension of time for processing the appeal, which extension shall be no more than sixty days on notice to you. All communications with the Plan Administrator or the H&H shall be deemed valid upon delivery by hand, overnight courier or registered mail addressed to the Life Insurance Plan Administrator, c/o Handy & Harman, 555 Theodore Fremd Avenue, Rye, New York 10580, Attn: Pension Benefits Coordinator.

Please be further advised that you have the right to bring a Civil Action under Section 502(a) of the Employees Retirement Income Securities Act ("ERISA"), 29 U.S.C. § 1132(a), following an adverse determination on review.

Sincerely,

Louis Klein

cc:    Compensation Committee of the Board of Handy & Harman

514288-1

## Exhibit A

### HANDY & HARMAN SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN
Handy & Harman Salaried

**Participant Data**

| | | | |
|---|---|---|---|
| First Name | | | DENNIS C |
| Last Name | | | KELLY |
| Social Security Number | | | D95-44-1839 |
| Date of Birth | | | March 11, 1952 |
| Date of Hire | | | September 3, 1985 |
| Spouse's Date of Birth | | | N/A |
| Date of Termination | | | September 15, 2005 |
| Normal/Postponed Retirement Date | | | April 1, 2017 |
| Benefit Commencement Date (BCD) | | | April 1, 2017 |

Earnings History

| Year | # Months | Gross Earnings | Limited Earnings |
|---|---|---|---|
| 2005 | 12 | $ 247,000 | $ 210,000 |
| 2004 | 12 | 244,500 | 205,000 |
| 2003 | 12 | 235,000 | 200,000 |
| 2002 | 12 | 203,000 | 198,000 |
| 2001 | 12 | 208,750 | 190,000 |
| 2000 | 12 | 215,750 | 182,000 |
| 1999 | 12 | 202,500 | 175,000 |
| 1998 | 12 | 139,578 | 127,000 |
| | | | |
| Total | 96 | $ 1,696,078 | $ 1,487,000 |

| Benefit Calculation | SERP Plan Doc 3(a) | SERP Plan Doc 3(b) |
|---|---|---|
| 1) Average Monthly Basic Pay: | $ 17,667.45 | $ 15,489.58 |
| 2) Vesting Service at Termination Date: | 20.083 | 20.083 |
| 3) Benefit Service at Termination Date: | 20.083 | 20.083 |
| 4) Participant's Expected Benefit Service at Normal Retirement Date: | 31.583 | 31.583 |
| 5) Accrued Benefit Calculation under the Salary-Related Formula | | |
| (i) 36.75% of Average Monthly Basic Pay | $ 6,848.15 | $ 5,002.21 |
| (ii) 11.25% of Average Monthly Basic Pay in excess of $833.33 | 1,893.84 | 1,846.83 |
| (iii) Minimum (25, Expected BS at NRD)/25 | 1.0000 | 1.0000 |
| (iv) Participant's Expected Monthly Normal Retirement Pension {(i) + (ii)} times (iii) | 8,739.99 | 7,851.04 |
| (v) Participant's Service Ratio {[3] / Max{[3],[4]}} | 0.6359 | 0.6359 |
| (vi) Accrued Monthly Pension {(iv) times (v)} | $ 5,557.82 | $ 4,995.17 |
| 6) Accrued Monthly Pension [SERP Plan Doc 3(a)-(SERP Plan Doc 3(b)]: | | $ 662.45 |
| 7) April 1998 SERP Payment With Interest | | 134,385.08 |
| 8) Annualized Value of April 1998 SERP Payment | | 1,336.55 |
| 9) Final Accrued Monthly Pension {Max[0,(6) – (8)]} | | $ 0.00 |
| 10) Net Monthly Benefit Payable at Benefit Commencement Date: | | |
| —Life Annuity Basis | | $ 0.00 |
| —10 C&C Basis | | 0.00 |
| —50% J&S Basis | | N/A |
| —100% J&S Basis | | N/A |

**Assumptions and Notes**

a) Average earnings prior to 1998 assumed to be less than the average monthly basic pay derived on a career average basis since 1998

b) The value of the April 1998 SERP payment of $96,287 was provided by Handy & Harman and has been increased with interest at 4% and annuitized at 4% and 1994 GAR Unisex mortality as an offset to the value of the SERP benefit at termination.

c) Present value of accrued monthly pension is based on 1994 GAR Unisex mortality and a 4.00% interest rate.

d) Participant is not entitled to receive the optional lump sum payment described in Section 10 of the January 1, 1998 SERP document due to his receipt of a prior lump sum, per the instruction of the plan's claim administrator.

e) Retirement age is assumed to be 65. The value of the SERP benefit will change depending on when benefits are commenced.

f) Gross earnings include 25% of MIP

Exhibit B

| BINDER I | |
|---|---|
| **TAB** | **DESCRIPTION** |
| A | 4/26/06 Demand Ltr. |
| B | Dixon Settlement and Release 3/31/98 |
| C | Kelly Settlement and Release 3/31/98 |
| D | Dixon Employment Agreement |
| E | Kelly Employment Agreement |
| F | SERP 1/1/98 |
| G | SERP 8/1/98 (Disputed) |
| H | Post Retirement Life Ins. Program 2/1/95 |
| I | Amendment to Post Retirement Life Ins. Program 8/1/98 (Disputed) |
| J | Amended and Restated Post Retirement Life Ins. Program 8/1/98 (Disputed) |

| BINDER II | |
|---|---|
| **TAB** | **DESCRIPTION** |
| 1 | SERP (as amended and restated as of January 1, 1998 |
| 2 | June 21, 1999 letter to Al Wheeler from Dennis Kelly re: increases in insurance coverage for pre- and post-retirement benefits |
| 3 | Draft of SERP (as amended and restated as of June 1, 1999) *various dates written in and crossed out as effective date |
| 4 | Dec. 9, 1999 letter to Paul Dixon from Watson Wyatt re; draft of SERP |
| 5 | June 18, 2001 memo from Dennis Kelly to Watson Wyatt re: Nance's accrued and lump sum benefits and attaching excerpts of SERP |
| 6 | June 20, 2001 letter from Watson Wyatt to Kelly re:  Nance's calculations |
| 7 | Aug. 22, 2001 letter to Dixon and Kelly from Wheeler attaching draft of SERP |
| 8 | Redlined version of draft of SERP attached in tab 7 |

| 9 | Dec. 6, 2001 note from Kelly to Wheeler re: definition of term "paid" in SERP |
|---|---|
| 10 | Dec. 11, 2001 letter to Dixon and Kelly from Wheeler re: revised draft of SERP |
| 11 | Draft of SERP (as amended and restated as of Jan. 2, 2002) |
| 12 | Redlined version of SERP attached in tab 11 |
| 13 | Fax from Wheeler to Dixon and Kelly enclosing memo on SERP |
| 14 | Oct. 31, 2002 letter to Dixon and Kelly from Wheeler attaching revised SERP with effective date of August 1998 |
| 15 | Nov. 25, 2002 memo from Kelly to Anthony Buonato (Watson Wyatt) attaching draft of SERP |
| 16 | Feb. 13, 2003 letter from Wheeler to Dixon and Kelly re: effective date of SERP |
| 17 | May 19, 2003 letter from Wheeler to Dixon and Kelly attaching drafts of Trust Agreements with respect to SERP and MIP, draft of post retired life insurance program, and draft of MIP deferral procedures |
| 18 | May 23, 2003 letter from Wheeler to Dixon and Kelly re: Trust Agreement with respect to SERP and post-retirement life insurance program |
| 19 | Aug. 28, 2003 memo from Dixon attaching SERP (as amended and restated as of Aug. 1, 1998), restated executive post-retirement life insurance program, and SERP election form to all eligible participants |
| 20 | Sept. 30, 2003 letter from Dixon to Wheeler attaching all signed benefit election forms for SERP |
| 21 | March 1, 2005 letter from Dixon to Wheeler re:  SERP provisions |
| 22 | March 10, 2005 letter from Dixon to Wheeler clarifying March 1, 2005 letter |

| BINDER III | |
|---|---|
| **TAB** | **DESCRIPTION** |
| A | E-mail from D. Kelly to Hynes et al. dated 3/2/05, with H&H SERP Plan calculations. |
| B | Draft memos re: H&H SERP Plan Differences.<br>        Doc. 344 with N. Trangucci interlineations.<br>        Doc. 341 with S. Tabin interlineations. |
| C | E-mail from D. Kelly to A. Wheeler, dated 5/20/05, with SERP calculations summary. |

2

| D | E-mail from D. Kelly to S. Tabin, dated 5/25/05, with H&H SERP and Life Insurance calculations. |
| E | Comparison of SERP scenarios by Towers Perrin. |
| F | Comparison of SERP scenarios by Peter Marciniak. |

**BINDER IV**

| TAB | DESCRIPTION |
|-----|-------------|
| 1 | Excerpts from WHX's Schedule 14A Proxy Statements |
| 2 | February 28, 2002 letter from Dennis Kelly to Arnold Nance |
| 3 | Unanimous written consent of H&H Board, effective as of April 3, 2003 |

**BINDER V**

| TAB | DATE | DESCRIPTION |
|-----|------|-------------|
| A | 8/5/98 | Minutes of Regular Meeting of WHX Compensation Committee |
| B | 8/5/98 | Meeting Agenda for WHX Compensation Committee Meeting 8/5/98 |
| C | 8/5/98 | Handwritten Notes from WHX Compensation Committee Meeting |
| D | 10/30/98 | Minutes of Meeting of Board of Directors of Handy & Harman |
| E | 11/5/98 | Minutes of Regular Meeting of WHX Compensation Committee |
| F | 11/5/98 | Meeting Agenda for WHX Compensation Committee Meeting 11/5/98 |
| G | 11/5/98 | Handwritten Notes from WHX Compensation Committee Meeting 11/5/98 |
| H | 2/2/99 | Minutes of Regular Meeting of WHX Compensation Committee |
| I | 2/2/99 | Meeting Agenda for WHX Compensation Committee Meeting 2/2/99 |
| J | 5/3/99 | Meeting Agenda for WHX Compensation Committee Meeting 5/3/99 |
| K | 8/4/99 | Minutes of Regular Meeting of WHX Compensation Committee |
| L | 8/4/99 | Meeting Agenda for WHX Compensation Committee Meeting 8/4/99 |

515084-1

3

# EXHIBIT B

U.S. Department of Labor        Pension and Welfare Benefits Administration
Washington, D.C. 20210



91-16A
Sec. 4(b)(5), 201(2), 301(a)(3),
401(a)(1)

APR  5 1991

Mr. Kenneth E. Kempson
Acting Associate Chief Counsel (Technical)
Office of Chief Counsel
Internal Revenue Service
CC Room 3527
1111 Constitution Avenue, N.W.
Washington, D.C.   20224

Dear Mr. Kempson:

This is in response to your request concerning whether a "rabbi
trust" arrangement, as described in a draft Revenue Procedure
(dated:  October 1, 1990), a copy of which was transmitted for
our review, would be considered to be "unfunded" for the purposes
of the so-called "excess benefit" and "top hat" plan exemptions
under sections 4(b)(5), 201(2), 301(a)(3) and 401(a)(1) of
Title I of the Employee Retirement Income Security Act (ERISA).

The draft Revenue Procedure provides, in Section 2, that the
Internal Revenue Service (the Service) generally will not issue
private letter rulings on deferred compensation arrangements that
use a trust other than the model "rabbi trust" described in
Section 5.02 of the Procedure.  Among the required provisions of
the model trust, and relevant to our consideration of your
request, are representations that the trust assets shall be
subject to the claims of the employer's general creditors in the
event of the employer's insolvency, as defined in the Procedure,
until paid to plan participants and their beneficiaries in such
manner and at such time as specified in the plan(s); and that it
is the intention of the parties that the trust shall constitute
an unfunded arrangement and shall not affect the status of the
plan as an unfunded plan maintained for the purpose of providing
excess benefits or deferred compensation for a select group of
management or highly compensated employees for purposes of
Title I of ERISA.  (See:  draft Revenue Procedure, Section 5.02
Model Provisions, paragraphs (d) and (e) of the model trust).

Other required provisions of the model trust specify that:  the
principal, and any earnings thereon, held in trust shall be used
exclusively for the purpose of plan participants and general
creditors; plan participants and their beneficiaries have no
preferred claim on, or any beneficial ownership interest in, any
assets of the trust; any rights created under the plan and the
trust agreement shall be mere unsecured contractual rights of
plan participants and their beneficiaries against the employer;
any assets held by the trust will be subject to the claims of the
employer's general creditors under federal and state law in the

- 2 -

event of insolvency, as defined the model trust; and benefits
payable to plan participants and their beneficiaries under the
trust agreement may not be anticipated, assigned (either at law
or in equity), alienated, pledged, encumbered, or subject to
garnishment, levy, execution or other legal or equitable process.
(See: Sections 1(d) and 13(b) of the model trust).

Section 1(e) of the model trust provides alternative provisions
(at least one of which must be selected by the employer when
establishing the trust) regarding the contribution of assets to
the trust.  Two of the alternatives require the employer,
following either a "change in control," as defined in the model
trust, or the end of the plan year(s) ending after the trust
otherwise becomes irrevocable, to make an irrevocable
contribution to the trust in an amount sufficient to provide for
the future payment to each plan participant or beneficiary the
benefits they would be entitled to receive under the terms of the
plan(s).  The alternatives also provide that if the employer
fails to make any of the required deposits under the terms of the
trust in a timely manner, the trustee shall take all reasonable
action, including the institution of appropriate legal
proceedings, to require the employer to make any and all payments
under the terms of the trust.  In addition, the alternatives
provide that plan participants and beneficiaries are third-party
beneficiaries of this provision of the trust and shall be
entitled to enforce the trust agreement against the employer as
if they were parties thereto and in their own names.  Under the
terms of the trust, the employer will pay all expenses, including
attorney's fees and court costs, reasonably incurred by the
trustee or plan participants and their beneficiaries in
connection with the enforcement of such provision.

You have requested an advisory opinion as to whether the
establishment and operation of the model trust, with the
inclusion of one of the alternative mandatory contribution
provisions, will cause an underlying excess benefit or "top hat"
plan to be other than "unfunded" for purposes of the exemptions
under sections 4(b)(5), 201(2), 301(a)(3) and 401(a)(1) of Title
I of ERISA.

Section 4(b)(5) of ERISA exempts from the coverage of all of
Title I of ERISA a plan that is both "unfunded" and an "excess
benefit plan" as defined in section 3(36) of ERISA.  Section
3(36) defines an excess benefit plan as "a plan maintained by an
employer solely for the purpose of providing benefits for certain
employees in excess of the limitations on contributions and
benefits imposed by section 415 of the Internal Revenue Code of
1986 on plans to which that section applies, without regard to
whether the plan is funded."  Sections 201(2), 301(a)(3) and
401(a)(1) exempt from the application of Parts 2, 3 and 4,
respectively, "a plan which is unfunded and is maintained by an

- 3 -

employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." (so-called "top hat" plans).

The Department is generally of the view that any determination of the "unfunded" status of a plan of deferred compensation requires an examination of the surrounding facts and circumstances, including the status of the plan under non-ERISA law.  In the absence of pertinent legislative history defining "unfunded" for purposes of Title I of ERISA, the Department believes that, in the case of an excess benefit or "top hat" plan, the position adopted by the Service regarding the tax consequences to trust beneficiaries should be accorded weight under Title I.  In a December 13, 1985, letter to the Service, the Department addressed the issue of "unfunded" in the context of "rabbi trust" arrangements that did not contain mandatory contribution provisions.  In that letter, the Department indicated that, in consonance with positions expressed by the Service in numerous private letter rulings, it was the working premise of the Department that a "top hat" plan (or excess benefit plan) would not fail to be "unfunded" for purposes of sections 4(b)(5), 201(2), 301(a)(3) and 401(a)(1) of Title I of ERISA solely because there is maintained in connection with such a plan a "rabbi trust" of the kind described in those rulings.  The inclusion of the mandatory contribution provisions described in the subject model trust does not change the Department's view.

Therefore, based on the facts and representations submitted as part of your request, and consistent with the Department's general views described above, it is the opinion of the Department that a plan will not fail to be "unfunded" for purposes of sections 4(b)(5), 201(2), 301(a)(3) and 401(a)(1) solely because there is maintained in connection with such plan a "rabbi trust" that conforms to the model trust described in the draft Revenue Procedure.

This letter constitutes an advisory opinion under ERISA Procedure 76-1.  Section 10 of the Procedure explains the effect of advisory opinions.

Sincerely,


Robert J. Doyle
Director of Regulations
  and Interpretations